UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2022 JAN 18 PM 1: 18

CLERK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ) | |
| TWO CELLULAR PHONES CURRENTLY ) | Case No. 2.22-mj-5-jay |
| LOCATED AT THE BURLINGTON FIELD ) | DEPUTY CLERK |
| OFFICE OF THE ATF ) | |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Brian Wood, being first duly sworn, hereby depose and state as follows:

### Introduction and Agent Background

1.    I make this affidavit in support of an application under Rule 41 of the Federal Rules
of Criminal Procedure for a search warrant authorizing the examination of two cellular
telephones—

- **One blue Apple iPhone bearing IMEI 353167663710010 and**

- **One black Apple iPhone, model A1660 bearing IMEI 355308084887882**

(collectively, the "**Electronic Devices**") which are described with particularity in Attachment A
and are currently stored in evidence at the Burlington Field Office of the Bureau of Alcohol,
Tobacco, Firearms, and Explosives (ATF)—and the extraction from the Electronic Devices of
the data described in Attachment B.

2.    I am a Special Agent with ATF, duly appointed according to law and acting as such.
Accordingly, I am a federal law enforcement officer authorized to investigate violations of the
laws of the United States and to request warrants pursuant to the Federal Rules of Criminal
Procedure.   I have been a Special Agent with the ATF for over 5 years.  My assignments have
included investigating criminal violations of federal firearms statutes, arson statutes, and
narcotics offenses related to the possession and distribution of controlled substances.  Prior to my

1

employment with ATF, I was employed by the United States Border Patrol as a Border Patrol Agent for over 6 years, during which time I also participated in investigations of criminal violations involving narcotics offenses related to the possession and distribution of controlled substances and violations of federal firearms statutes.

3.   Based on my training and experience I know the following:

a.   Persons who participate in the distribution of controlled substances frequently use cellular telephones and other electronic devices to coordinate their unlawful activities and to maintain contact with suppliers and consumers of illegal drugs.

b.   I know that information stored in the memories of these communications devices often constitutes evidence of drug trafficking and the movement and disposition of currency representing the proceeds of the drug trafficking. Among other things, the evidence may contain the telephone numbers assigned to the communication devices, messages received by or sent from the devices, identification numbers and other information contained in their electronic memories, and the records of telephone numbers to which communications were sent and from which communications were received.

c.   Using their cellular telephones, drug traffickers often take photographs of other members of their organizations, the controlled substances, cash from drug sales, assets obtained from profits of drug sales, locations associated with their illegal activity, and other evidence pertaining to the crimes.

d.   I also know that persons engaged in such illegal activities will often deny ownership of these phones in an attempt to thwart law enforcement's efforts to connect them to the crimes under investigation, as well as to co-conspirators, customers, and their sources of supply for controlled substances.

e.   Data contained in cellular telephones may reveal the physical location of the cellular phone at various times.  For example, the camera embedded on the phone may record its latitude and longitude at the time it takes a photograph and record that location in the metadata associated with the picture. Also, if a cellular phone has Global Positioning System ("GPS") capabilities (which many do), additional information regarding locations of the phone, while it follows GPS directions, may be recovered from the device.

4.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. Because this affidavit is intended only to show probable cause for the requested search warrant, it does not set forth all of my knowledge about this matter. Unless otherwise specified, the statements of individuals described in this affidavit are related in sum and substance, are not intended to be complete descriptions of the entire statements, and are not intended to be quotations.

5.    Based on the facts set forth in this affidavit, there is probable cause to believe that evidence of crimes committed by Eddy SANTIAGO and others known and unknown to law enforcement—specifically, violations of 21 U.S.C. §§ 841(a)(1), 843(b), and 846, which include the distribution of controlled substances, the use of communication facilities in furtherance of those distributions, and conspiracy to distribute controlled substances—and violations of 18 U.S.C. §§ 844(e) and 1952—the use of a telephone to make a threat to damage or destroy a building or vehicle by means of fire and travel in interstate commerce to commit an act of violence to further an unlawful activity—will be located on the Electronic Devices. The Electronic Devices were seized on January 5, 2022, and they are currently stored in the ATF Burlington Field Office in a manner that is likely to preserve the electronic data on each phone.

## **Probable Cause**

### Subscriber and User Information

6.   As part of this investigation, I requested, obtained, and reviewed subscriber data and toll records for TARGET PHONE 1 that were provided by Verizon pursuant to a subpoena. TARGET PHONE 1 is a prepaid phone with a mobile telephone number (MTN) of 518-312-2658 that had an effective date of November 15, 2021, and a Verizon account number of 1069650797. The subscriber first and last name associated with TARGET PHONE 1 are both listed as "EPAY". As described below, I believe the user of TARGET PHONE 1 was Eddy SANTIAGO, the primary suspect in this investigation.

7.   As part of this investigation, I also requested subscriber data and toll records for TARGET PHONE 2 and TARGET PHONE 3 by subpoena, but I have not yet received or reviewed the requested records.

### Historical Information

8.   On September 24, 2020, Abigail Quesnel was arrested by New York State Police (NYSP) and transported to the NYSP barracks in Queensbury, New York.[1] DEA Special Agent (SA) Timothy Hoffmann and I traveled to the NYSP barracks and conducted an audio/video recorded interview of Abigail Quesnel. NYSP Investigator Cecile LeBarron was also present during the interview. As part of our investigation of Abigail Quesnel's activities prior to her

---

[1] Based in part on this arrest, Abigail Quesnel was charged with and convicted of Conspiracy to Distribute and Possess with Intent to Distribute Cocaine, Cocaine Base, and 100 Grams or more of Heroin in violation of 21 U.S.C. §§ 846 and 841 under District of Vermont case number 2:20-cr-00101-2. She was sentenced for that offense on November 2, 2021, pursuant to a plea agreement with the United States. She had previously been convicted of Possession with Intent to Distribute Cocaine (2008 felony) and Possession of Crack Cocaine (2007 felony) in Massachusetts.

4

September 2020 arrest, as well the activities of her husband John Quesnel, I had observed the
Quesnels living on Sampson Road Extension in Cornwall, Vermont. The following
subparagraphs summarize some of the statements made by Abigail Quesnel regarding an
individual identified as Eddy SANTIAGO during that interview.

      a.   Abigail Quesnel stated that she and John Quesnel (her husband) used to work
with "Ed" SANTIAGO. I interpreted her statement regarding "work" as the acquisition,
transportation, and distribution of controlled substances, which she referred to as "drugs."
Abigail Quesnel stated she would transport the drugs, while "Ed" would ride in a separate
vehicle that accompanied her.

      b.   Abigail Quesnel stated that "Ed" has previously threatened her life by putting
a gun to her head. Abigail Quesnel stated that the last time she saw "Ed" was two or
three months before the interview (which was occurring on September 24, 2020).
Abigail Quesnel stated "Ed" wanted John Quesnel to go back to "working" with "Ed."
Abigail Quesnel stated that John Quesnel used to work for "Ed," which I interpreted as
assisting SANTIAGO in the distribution of controlled substances in Vermont. Abigail
Quesnel stated "Ed" told her and John Quesnel that they owed him $10,000 because "Ed"
got them started in the distribution of drugs. She stated they had been doing it before
"Ed" showed up, which I interpreted as them having been involved in the distribution of
controlled substances before they were obtaining the controlled substances from
SANTIAGO. Abigail Quesnel stated that she and John Quesnel "just wanted to see what
he had," which I interpreted as their intention to see if SANTIAGO would be a reliable
source of controlled substances.

   c.   Abigail Quesnel stated "Ed" once called her through Facetime or via

Facebook Messenger and she observed the name "Edward Santiago" as being associated

with "Ed".  Abigail Quesnel stated "Ed" once asked her what his name was, and she

replied, "Edward Santiago".  Abigail Quesnel stated "Ed" seemed surprised that she

knew his name and asked her how she knew it.  Quesnel stated that "Ed's" Facebook

profile was at that time under some variation of the name "Escobar".  She stated "Lexi"

and "Jody" had both worked for "Ed" distributing drugs.

   9.  On October 14, 2020, DEA SA Kevin Kadish and I conducted an audio-recorded

interview of John Quesnel in Middlebury, Vermont.[2]  The following subparagraphs summarize

some of the statements made by John Quesnel regarding an individual identified as Eddy

SANTIAGO during that interview.

   a.   John Quesnel stated a male subject named Ed SANTIAGO had contacted him

recently about providing Quesnel with cocaine to sell.  John Quesnel described

SANTIAGO as 6'4" tall black male.  John Quesnel stated SANTIAGO wanted to provide

Quesnel with "50 hard, 50 soft".  Based on my training and experience, I interpreted that

as 50 grams of cocaine base and 50 grams of cocaine powder, respectively.

   b.   John Quesnel stated someone told him that SANTIAGO's "guy" was arrested

with "two kilos" and that SANTIAGO was reverting to using an old source of supply for

cocaine.

_____

[2] John Quesnel was charged with and convicted of Distribution of Cocaine in violation of 21
U.S.C. § 841 and Possession of a Firearm by an Unlawful User of a Controlled Substance in
violation of 18 U.S.C. § 922(g)(3) under District of Vermont case number 2:20-cr-00101-3 on
July 15, 2021.  He is awaiting sentencing while he participates in the District of Vermont Drug
Court program in the Rutland Division.  I am aware of two previous felony convictions, as well:
DUI #3-INFLUENCE, which was entered in 1997 in Addison County, Vermont; and (2) DUI #4
OR SUBSEQUENT/INFLUENCE, which was entered in 2000 in Addison County, Vermont.

6

c.  John Quesnel stated that two or three years ago SANTIAGO had burned down the house of a male subject named "Scully". John Quesnel stated Scully's father almost died in the fire. John Quesnel stated that "Scully" owed SANTIAGO a drug debt and that the debt was SANTIAGO's motive for burning down Scully's house. John Quesnel stated that "Scully" lives somewhere past Rutland and that SANTIAGO had told him that "Scully" distributed cocaine and heroin. John Quesnel stated SANTIAGO had sworn to him on several occasions that SANTIAGO had burned down Scully's house.

d.  John Quesnel stated that an individual named "Eli" was SANTIAGO's cousin and that John Quesnel suspected "Eli" was the driver for SANTIAGO when he burned down Scully's house. John Quesnel stated that SANTIAGO threatened to burn down the Quesnels' house numerous times during their association. John Quesnel stated that "Eli" had stayed with Quesnel at his residence because of the money SANTIAGO believed the Quesnels owed SANTIAGO. John Quesnel stated that "Eli" left after SANTIAGO robbed "Taco" (whom I know to be Kevin "Taco" Williams, who was convicted of conspiracy to distribute controlled substances in the same federal case as Abigail Quesnel and John Quesnel).

e.  John Quesnel stated SANTIAGO used to stay with Lori Daniels.

f.  John Quesnel stated SANTIAGO had been distributing drugs in Vermont for at least five years.

g.  Regarding SANTIAGO's profits from the drug trade, John Quesnel estimated he and his wife had "put over $1,000,000 in his pocket". John Quesnel also stated SANTIAGO thinks the Quesnels owe him thousands of dollars. John Quesnel stated SANTIAGO distributes heroin, cocaine, and MDMA.

7

10. Also on October 14, 2020, after our interview of John Quesnel, John Quesnel sent me pictures of text messages between John Quesnel and Ed Santiago, who was using phone number (917) 628-6459. The apparent incoming messages from SANTIAGO included the following phrases. I was not able to determine the dates of the messages from the pictures I received.

      a.  "The work came in"

      b.  "I still haven't gotten takin care of this bitch nigga"

      c.  "I don't want to front you something and then you go invest my dough elsewhere"

      d.  "And we both know you not to be trusted"

      e.  "I was tryna get you 60 of hard and soft"

      f.  "We gotta put it to action"

      g.  "Imma give you another chance"

      h.  "But I will tell you now I'm only given you a few at a time"

      i.  "And you can't let Abby still from you as usual", and

      j.  "steal*** Also try to flip shit fast. I need to save and pay off my plug talk to you tomorrow".

11. Based on my training, experience and knowledge of this investigation, I interpret these messages as being consistent with SANTIAGO attempting to provide John Quesnel with cocaine base ("hard") and cocaine powder ("soft") for distribution.

12. I have also reviewed a report from the Vermont State Police on July 7, 2020, in which two troopers responded to the Quesnel residence on Samson Road Extension in Cornwall following a 911 hang-up call on that date. The troopers spoke with John Quesnel at his residence, and John Quesnel stated Ed SANTIAGO had been at his residence and had punched him. John

Quesnel advised that he then shot his BB-gun at SANTIAGO and that he might have hit

SANTIAGO in the arm.  John Quesnel and Abigail Quesnel told the troopers SANTIAGO was

mad at them because he believed they owed him $800.  John Quesnel and Abigail Quesnel both

denied using cocaine when the troopers asked them about it during that contact.  The troopers

photographed the front door with holes through the door frame that John Quesnel indicated were

from BBs.  Later, on October 2, 2020, I participated in the execution of a search warrant at the

Quesnels' residence on Samson Road Extension as part of the drug conspiracy investigation

which ultimately lead to their convictions in District of Vermont case number 2:20-cr-00101.  I

observed the hole that was supposedly made by a BB and concluded, based on my training and

experience, that it was more consistent with having been made by a small-caliber bullet.


Vehicle Fire on September 29, 2021, and Interviews of Subject 1

13. In November 2021, DEA SA Kevin Kadish and I spoke with Middlebury Police

Department (PD) Officer Casey Covey regarding a suspected arson event in September 2021 in

which Eddy SANTIAGO was a suspected arsonist.  Officer Covey stated he responded to a

report of a motor vehicle on fire at 464 Airport Road in Middlebury, Vermont on September 29,

2021, at approximately 3:00 am.  Officer Covey stated the vehicle belonged to Subject 1,[3] who

resided at 464 Airport Road.  Officer Covey stated the Middlebury Fire Department Chief David

Shaw also responded to the scene.  Officer Covey stated Chief Shaw indicated the gas cap of

---

[3] Subject 1's identity is known to law enforcement, and their name is excluded here to prevent
potential retaliation for their involvement in the investigation.  I am familiar with Subject 1's
criminal history based on my review of entries in criminal history databases, and I am aware of
the following conviction for Subject 1: Disorderly Conduct – Fight (2019 misdemeanor).
Subject 1 also has current pending Vermont state charges for DUI #1 Drug or Both (2020
misdemeanor) and Possession of Regulated Drug (2020 misdemeanor).

Subject 1's vehicle was removed from the vehicle and something appeared to have been stuck down the neck of the gas tank.

14. Officer Covey stated Subject 1 told Officer Covey that Subject 1 suspected Eddy SANTIAGO to have started the fire. Subject 1 stated that Subject 1 was a previous user of drugs and that Subject 1 would purchase drugs from SANTIAGO. Subject 1 stated approximately six months prior to this incident, Subject 1 stole drugs from SANTIAGO. Subject 1 stated that, after the theft, SANTIAGO assaulted Subject 1 and that Subject 1 threw a fire extinguisher through the window of SANTIAGO's BMW. Subject 1 stated that Subject 1 had heard of SANTIAGO previously setting fire to a drug dealer's car in Rutland, Vermont after SANTIAGO and the dealer got in a fight.

15. Officer Covey stated he spoke to Subject 1 again on October 1, 2021. In summary, Officer Covey stated Subject 1 stated that Subject 1 had known SANTIAGO for approximately three years. Subject 1 knew SANTIAGO to sell heroin/fentanyl, cocaine base, and cocaine powder. SANTIAGO was familiar with Subject 1's residence and had been there on many occasions. Approximately three days prior to his motor vehicle being set on fire (on September 29, 2021), Subject 1 heard from someone that they had observed SANTIAGO in the area at a Hannaford supermarket in Middlebury.

16. On January 10, 2022, DEA SA Kevin Kadish and I interviewed Subject 1. Middlebury PD Officer Casey Covey was also present for that interview. I found the statements made by Subject 1 in that interview to be generally consistent with the statements provided to me by Officer Covey from Subject 1's previous interviews. During this interview, Subject 1 also stated SANTIAGO had made multiple threats to Subject 1 in person regarding SANTIAGO's

intention to burn down Subject 1's residence because SANTIAGO believed Subject 1 stole

heroin, cocaine, and money from SANTIAGO.


Reports and Surveillance

17. In November 2021, DEA SA Kevin Kadish and I spoke with Vergennes PD Patrol

Officer Jill Harter and Detective Sergeant (Det. Sgt.) Jason Ouellette regarding Eddy

SANTIAGO's activities in the Vergennes, Vermont area.  They had received reports from

multiple individuals that SANTIAGO and his associates had been frequenting a residence at 49

Booth Woods in Vergennes, and individuals had reported suspicious activity involving

SANTIAGO and others coming and going from the residence in a manner they concluded was

consistent with drug trafficking.  Officer Harter and Det. Sgt. Ouellette stated SANTIAGO had

been observed operating a gray BMW bearing New Jersey registration T39LYU at that

residence.  I reviewed the registration information for that plate number, which described the

vehicle as a gray 2011 BMW model 328 with Vehicle Identification Number (VIN)

WBAPK5C57BA661953; it is registered to Eddy Santiago Jr. at 90 E 3rd Street in Clifton, New

Jersey.  Officer Harter and Det. Sgt. Ouellette also stated a witness, known to them by name, had

reported observing a white male associate of SANTIAGO carrying a firearm near a green Volvo

parked at 49 Booth Woods.  Officer Harter provided me with still-frame images of SANTIAGO

and associates outside of 49 Booth Woods.

18. On December 21, 2021, the DEA office in Paterson, New Jersey applied for and

obtained a federal search warrant from United States Magistrate Judge James B. Clark III in the

District of New Jersey to install and monitor a GPS tracker on the gray BMW 328i bearing New

Jersey registration T39LYU that was associated with Eddy SANTIAGO.  The warrant was

11

executed by placing the tracker on the BMW in the District of New Jersey on December 23,

2021, and federal law enforcement began tracking SANTIAGO's vehicle.

19. On January 3, 2022, DEA SA Kevin Kadish and I observed the GPS data for

SANTIAGO's BMW and noted the tracker had traveled from New Jersey to Vermont. Prior to

SANTIAGO and the BMW arriving in Vermont, I conducted surveillance of 49 Booth Woods in

Vergennes. I am familiar with Booth Woods and know it to be a one-way loop road with both

the entry and exit ends located on Green Street. I am also familiar with the location of 49 Booth

Woods, which is located at the end of a short cul-de-sac near the exit of Booth Woods. On

January 3, 2022, I observed that there was a sedan of unknown color, a black sedan, and a silver

sedan all parked in the area of 49 Booth Woods. I also noticed that the short road leading

downhill to 49 Booth Woods and the other residences in the cul-de-sac was very icy. In addition

to monitoring the GPS data, members of the DEA Burlington Office and I conducted periodic

physical surveillance of SANTIAGO's BMW once it entered Vermont. On the same date, DEA

SA Adam Chetwynd observed the BMW traveling between Fair Haven and Middlebury,

Vermont. We then observed the GPS tracker travel to and stop briefly in the area of 9 Maecliff

Court in Middlebury, Vermont. I then observed the BMW travel from the area of 9 Maecliff

Court toward the area of 49 Booth Woods; we then observed the GPS data follow that path and

stop in the area of Booth Woods. SA Kadish then observed the BMW parked on the side of the

road, toward the end of Booth Woods, just past the short downhill road that leads to 49 Booth

Woods. We terminated physical surveillance shortly thereafter. Later that night, SA Kadish and

I observed the GPS tracker data travel to the DoubleTree hotel at 870 Williston Road in South

Burlington, Vermont.

12

20. On January 4, 2022, SA Kadish and I continued to monitor the BMW GPS tracker data, and members of the DEA Burlington Office and I also continued periodic physical surveillance of Eddy SANTIAGO and the BMW. SA Kadish and I observed the GPS tracker data travel to 483 Rand Road in Randolph, Vermont; the data also showed the GPS tracker traveled twice to 49 Booth Woods (around 12:56 pm and around 7:05 pm). During physical surveillance, I observed the BMW parked near the exit of Booth Woods at approximately 1:00 pm. During physical surveillance, DEA SA Kristian Pinkham observed Eddy SANTIAGO at a gas station with the BMW while wearing a dark-colored jumpsuit with a red stripe down the arms and legs. SA Kadish and I observed the GPS data showed the tracker traveled back to the DoubleTree hotel in South Burlington at approximately 8:16 pm. SA Kadish and I later reviewed the GPS tracker data and observed that the GPS tracker had left the DoubleTree hotel at approximately 10:46 pm, traveled briefly to the Blue Mall at 150 Dorset Street in South Burlington, and then returned to the DoubleTree hotel.

21. On January 4, 2022, Vergennes PD received a report from a resident of 49 Booth Woods, referred to hereafter as Subject 2,[4] who stated that Eddy SANTIAGO had traveled to 49 Booth Woods and slashed the tires on Subject 2's vehicle that day. Subject 2 also stated that Eddy SANTIAGO had threatened to set fire to their house.

Vehicle Fire on January 5, 2022, and Interviews of Subjects

22. On January 5, 2022, at approximately 5:08 am, DEA SA Kevin Kadish was notified by Vergennes PD Officer Jill Harter that a vehicle and the residence of 49 Booth Woods had

---

[4] Subject 2's identity is known to law enforcement, but their name is excluded here to prevent potential retaliation for their involvement in the investigation. I have searched criminal history databases, and I am not aware of any prior convictions for Subject 2.

been set on fire and that SANTIAGO was a suspect. SA Kadish reviewed the GPS tracker data

for SANTIAGO's BMW and observed that the BMW was in the area of 49 Booth Woods at the

suspected time of the fire—between approximately 4:54 am and 5:00 am—and that it was now

travelling southbound on Route 7 toward Middlebury, Vermont. SA Kadish contacted

Middlebury PD Officer Nick Stewart and requested his assistance in locating SANTIAGO,

stopping his vehicle, and taking SANTIAGO into custody due to his suspected involvement in

setting fire to the vehicle and residence at 49 Booth Woods. Officer Stewart located

SANTIAGO's BMW, and members of Middlebury PD conducted a vehicle stop and took

SANTIAGO into custody along Route 30 in Sudbury, Vermont. Middlebury PD secured

SANTIAGO's BMW and had it towed to the Middlebury Police Department, where it was held

while officers sought a search warrant. SANTIAGO was transported to the Vergennes Police

Department, where I had an opportunity to observe him; SANTIAGO was wearing a dark-

colored track suit with red stripes down the arms and legs, as well as a dark-colored puffer vest.

23. I have viewed the damage to vehicles and the residence at 49 Booth Woods in person

and through photographs and video. I have also spoken with Vermont State Police (VSP) Det.

Sgt. Matthew Hill from the VSP Fire Investigation Unit, who had responded to investigate the

fires at 49 Booth Woods on January 5, 2022. Det. Sgt. Hill stated that the vehicle fire appeared

to be incendiary and that he smelled the odor of gasoline both inside the vehicle closest to the

residence that was on fire and inside the vehicle parked immediately behind that vehicle. Det.

Sgt. Hill stated he had watched a video from a Ring camera on a nearby residence of the vehicle

fire starting, and he stated that what he saw was consistent with a fire being set using an

accelerant. Det. Sgt. Hill determined the origin of the fire was inside the vehicle that was parked

closest to the residence, and the fire spread to the residence from the vehicle. Det. Sgt. Hill

stated that a handheld combustible ignition source, such as a match, was likely used. Det Sgt. Hill stated he took samples from the fire scene and sent them to the lab.

24. On the morning of January 5, 2022, as part of the investigation of the cause of the fire, Vergennes PD Officer Jill Harter obtained video recordings from two Ring cameras of properties neighboring 49 Booth Woods. I have reviewed those recordings. The video shows an individual, consistent in appearance with Eddy SANTIAGO and wearing a dark-colored track suit with red stripes down the arms and legs, approach the area of 49 Booth Woods from the direction of the main road of Booth Woods on foot while carrying a red gas can. The video shows the subject approaching three vehicles parked in front of the residence at 49 Booth Woods. It appears the subject opened the doors of one of the vehicles. The video shows the subject walking away from the vehicle parked closest to the residence as it ignites in flames. The video shows the subject walk to the next closest vehicle that was parked directly behind the burning vehicle and remain near that vehicle for a short time. The video then shows the subject walking back toward the main road of Booth Woods while carrying the red gas can.

25. On January 5, 2022, SA Kadish and I observed the GPS data, which showed the tracker had traveled to the Maplefields gas station at 811 Williston Road in South Burlington, Vermont at approximately 4:17 am that morning. Later that day, ATF SA Matthew Ekstrom requested and received video from the Maplefields gas station around the time the GPS tracker showed SANTIAGO's BMW was present. I have viewed the gas station video, and it appears to show an individual wearing a dark-colored track suit with red stripes down the arms and legs, as well as a dark-colored puffer vest, putting gasoline into a red gas can and into SANTIAGO's BMW bearing NJ registration T39LYU. The individual depicted in the video was physically

consistent with SANTIAGO. The video appears to show the individual placing the red gas can in the front passenger area of the BMW after filling it with gasoline.

26. As part of the investigation into the fire at 49 Booth Woods on January 5, 2022, DEA SA Kevin Kadish and members of the Vergennes Police Department interviewed Subject 2. Subject 2 is a resident of 49 Booth Woods and was present at the residence when the fire was set. During the interview, Subject 2 stated Eddy SANTIAGO had threatened Subject 2 in person when SANTIAGO traveled to Booth Woods during the evening of January 4, 2022. Subject 2 told SA Kadish that SANTIAGO warned Subject 2 he was going to burn down Subject 2's residence if Subject 2 and other individuals there did not repay a drug debt to SANTIAGO.

a. Subject 2 originally stated the debt was $500 to $2,000 for cocaine, but Subject 2 later clarified (during a phone call on January 6, 2022) that the drug debt SANTIAGO was attempting to collect was $9,000 for approximately 101 grams of cocaine due to other customers not paying Subject 2.

b. Subject 2 had met Eddy SANTIAGO about two years ago through a mutual friend, who Subject 2 refused to identify. Subject 2 admitted to being a cocaine user and to having purchased cocaine from SANTIAGO since they met two years earlier. Subject 2 stated the most recent purchase of cocaine from SANTIAGO occurred about two weeks earlier, when Subject 2 purchased a "1/2 ball" (which, based on my training and experience, I interpret as 1/16th of an ounce or approximately 1.7 grams) for $125 inside 49 Booth Woods.

c. Subject 2 said that SANTIAGO had previously stayed overnight at 49 Booth Woods two or three times while SANTIAGO was previously in Vermont, with the last stay occurring sometime prior to December 25, 2021. [In my review of the GPS data for

16

the tracker installed on SANTIAGO's BMW, the BMW did not appear to be in Vermont between the date of installation—December 23, 2021—and December 25, 2021. Accordingly, Subject 2 may have been describing a date earlier than December 23, or SANTIAGO may have traveled in a different vehicle for the last stay described by Subject 2.]

      d.   Subject 2 said that, about one month ago, SANTIAGO told Subject 2 he had 200 grams of cocaine.  Subject 2 stated they had exchanged text messages, but Subject 2 refused to show SA Kadish the messages or the phone's call log.   Subject 2 did, however, state that SANTIAGO used phone number 518-312-2658 (TARGET PHONE 1) in their exchanges, while Subject 2 used phone number 802-377-1448 (TARGET PHONE 2).  Subject 2 also provided SA Kadish with an audio recording of a phone call with Eddy SANTIAGO on January 4, 2022.  According to Subject 2, this particular phone call was between SANTIAGO using TARGET PHONE 1 and Subject 2 using TARGET PHONE 3 (associated with Subject 3) rather than TARGET PHONE 2; Subject 2 used TARGET PHONE 2 to record the last portion of the phone call.  I have since listened to the recording, and the following is a summary of some of the conversation between SANTIAGO and Subject 2.  I have not yet been able to obtain and review call detail records to corroborate which phones were involved in the communication.

      i.   SANTIAGO stated, "You gonna lose more than what the fuck you owe me."

      ii.   In response to Subject 2 asking SANTIAGO if he is going to burn the house down, SANTIAGO replied, "I swear on my son you guys fucking playing with me. I'm in a tight fucking situation."  SANTIAGO also said, "I swear to god

on everything I love that I will fucking lose everything. And y'all playing. You guys imposing other people that don't even got shit to do with it. Y'all selfish as fuck."

iii.   SANTIAGO stated, "Y'all car gonna end up just like [inaudible] car. Only reason I didn't do that shit to John and Abby's is cause I made hundreds of thousands with them. I ain't made shit with y'all." I conclude that this statement was consistent with John Quesnel's and Abigail Quesnel's statements about and involvement in drug distribution with "Ed" Santiago.

iv.   Subject 2 informed SANTIAGO that he was being recorded, and SANTIAGO replied, "I don't give a fuck. You a fucking drug dealer. What you gonna do go and tell the cops? And you gonna keep selling drugs you fucking junkie."

v.   SANTIAGO also stated, "All I fucking know is don't even gotta do it. I don't even gotta do that shit. That shit get handled easily. That shit costs a couple fucking bundles of fucking heroin."

vi.   At the end of the conversation, SANTIAGO stated, "I don't give a fuck what you [inaudible] them police, I promise you on my son's life. I promise you y'all gonna lose more than I will."

27. Following the fire at 49 Booth Woods, DEA SA Kevin Kadish and I spoke with additional individuals who reside at 49 Booth Woods with Subject 2. We interviewed Subject 3

on January 5, 2022.[5]  The following is a summary of some of the statements made by Subject 3 during this audio-recorded interview.

     a.  Subject 3 lives at 49 Booth Woods with Subject 2, Subject 4, and Subject 5. Subject 3 is dating Subject 4.  Subject 2, Subject 3, Subject 4, and Subject 5 are all cocaine users.  Subject 3 previously used heroin but has since recovered and now only uses cocaine a few times a week.  Subject 3 met SANTIAGO through Subject 2 and Subject 5 (who are likewise dating).  Subject 3 provided Subject 5's cell phone number as 802-377-7188 (TARGET PHONE 3).

     b.  Subject 3 and Subject 4 received approximately one-eighth ounce of cocaine from SANTIAGO as payment when SANTIAGO stayed at 49 Booth Woods for multiple nights.  Subject 3 would purchase cocaine from SANTIAGO for $100 per gram.

     c.  Subject 3 was present in 49 Booth Woods during the threatening phone call between SANTIAGO and Subject 2 summarized in paragraph 25.d above.  The phone call occurred after Subject 2 observed that the tires on Subject 2's vehicle had been slashed, as mentioned in paragraph 20 above.  Subject 2 and Subject 5 told Subject 3 they owed a drug debt to SANTIAGO; they had been fronted drugs by SANTIAGO but had not paid him for the drugs.

     d.  SA Kadish showed Subject 3 a photograph of SANTIAGO that was taken after SANTIAGO was in custody, and Subject 3 identified the subject in the photograph as Eddy SANTIAGO.

---

[5] Subject 3's identity is known to law enforcement, but their name is excluded here to prevent potential retaliation for their involvement in the investigation.  I am familiar with Subject 3's criminal history based on my review of entries in criminal history databases, and I am aware of the following conviction for Subject 3: Disorderly Conduct-Fight (2008 misdemeanor).

28. On January 5, 2022, SA Kadish and I also interviewed Subject 4, another resident of 49 Booth Woods.[6] The following is a summary of some of the statements made by Subject 4 during the recorded interview.

      a. Subject 4 is dating Subject 3. Subject 4 has lived at 49 Booth Woods for approximately five years. Subject 2 and Subject 5 have lived in the residence with them (Subject 4 and Subject 3) for approximately the past two or three months.

      b. Subject 4 met SANTIAGO through Subject 2 and Subject 5. Subject 4 had observed SANTIAGO with an estimated 50-100 grams or three ounces of cocaine in the living room of 49 Booth Woods in November 2021. Subject 4 advised SANTIAGO not to sell drugs out of the residence.

      c. SANTIAGO would provide cocaine to Subject 4 in exchange for SANTIAGO staying at the residence at 49 Booth Woods. SANTIAGO last stayed at 49 Booth Woods the week before Christmas in 2021. SANTIAGO advised Subject 4 that SANTIAGO had made a trip to Randolph for the day during that stay.

      d. SANTIAGO had been at 49 Booth Woods the night before the fire, on January 4, 2022, after the tires had been slashed on Subject 2's vehicle. Subject 4 would not let SANTIAGO into the residence. SANTIAGO told Subject 4 that he would burn down the residence if Subject 4 did not help him collect the money owed him by Subject 2 and Subject 5.

---

[6] Subject 4's identity is known to law enforcement, but their name is excluded here to prevent potential retaliation for their involvement in the investigation. I am familiar with Subject 4's criminal history based on my review of entries in criminal history databases, and I am aware of the following convictions for Subject 4: DUI (2005 misdemeanor), Vehicle Operation-License Suspended for DUI (2009 misdemeanor), Disorderly Conduct-Fight (2010 misdemeanor), Interference with Access to Emergency Services (2010 misdemeanor).

e.  SANTIAGO previously told Subject 4 that SANTIAGO had a firearm, but Subject 4 never saw SANTIAGO with a firearm.

f.  Subject 4 stated customers, whom Subject 4 referred to as "friends," had come to 49 Booth Woods to purchase cocaine from Subject 2 and Subject 5.  Subject 4 had assisted with those cocaine transactions on some occasions.

29. On January 6, 2022, SA Kadish and I interviewed another resident at 49 Booth Woods, referred to hereafter as Subject 5.[7]  The following is a summary of some of the statements made by Subject 5 during the recorded interview.

a.  Subject 5 lives at 49 Booth Woods and is dating Subject 2.  Subject 5 is a user of cocaine.

b.  Subject 5 knew Eddy SANTIAGO as "E" prior to the incident involving the fire at 49 Booth Woods.  Subject 5 met SANTIAGO through John and Abigail ("Abby") Quesnel.  Subject 5 met SANTIAGO when SANTIAGO was staying with John and Abigail Quesnel at their residence on Samson Road (which I know to have been their residence on Samson Road Extension in Cornwall, Vermont in 2020).

c.  Subject 5 knew SANTIAGO to be selling cocaine at the time he was staying at the Quesnel residence.  Subject 5 purchased cocaine from SANTIAGO at the Quesnel residence on multiple occasions.  Subject 5 observed SANTIAGO cooking a quantity of cocaine that filled a Pyrex-style measuring cup at the Quesnel residence.  Subject 5 knew SANTIAGO to stay at the Quesnel residence until John Quesnel shot SANTIAGO

---

[7] Subject 5's identity is known to law enforcement, but their name is excluded here to prevent potential retaliation for their involvement in the investigation.  .  I have searched criminal history databases, and I am not aware of any prior convictions for Subject 5.

through the door of the Quesnel residence.    I believe that statement corresponds with the event partially described in paragraph 12, above.

d.   In approximately November 2021, SANTIAGO contacted Subject 5 regarding staying with Subject 5 at 49 Booth Woods.  Shortly after that contact, SANTIAGO began occasionally staying at 49 Booth Woods.  Between that time through the present, Subject 5 knew SANTIAGO to come to Vermont approximately every two weeks.  Subject 5 and the other residents at 49 Booth Woods would receive cocaine in exchange for SANTIAGO staying at 49 Booth Woods.  Subject 5 and Subject 2 would receive approximately one-eighth ounce of cocaine, and Subject 3 and Subject 4 would also receive approximately one-eighth ounce of cocaine for the accommodation.

e.   Subject 5 knew SANTIAGO to distribute cocaine and heroin in Vermont. Subject 5 knew SANTIAGO was distributing heroin because Subject 5 had a conversation with SANTIAGO regarding SANTIAGO approaching Subject 3 about heroin distribution.

f.   SANTIAGO contacted Subject 5 via text message on January 1, 2022, and told Subject 5 that SANTIAGO was sick and was going to travel to 49 Booth Woods on January 3, 2022.

g.   Subject 5 knew that all residents at 49 Booth Woods were in debt to SANTIAGO for cocaine but did not know that the debt was $9,000 until January 4, 2022. SANTIAGO would front Subject 5 one-quarter to one-half ounce of cocaine each time he stayed in Vermont.

22

h. The second time SANTIAGO stayed at 49 Booth Woods, Subject 5 observed a pistol in SANTIAGO's waistband. When Subject 5 asked SANTIAGO about the pistol, SANTIAGO replied that the handgun was his "baby".

i. SA Kadish showed Subject 5 a picture of SANTIAGO, and Subject 5 identified the subject in the photograph as Eddy ("E" or "Ed") SANTIAGO.

j. Subject 5 stated that Subject 5 had communicated with SANTIAGO via text message, but Subject 5 had deleted those messages. Subject 5 used Target Phone 3 to communicate with SANTIAGO, who was using Target Phone 1.

Search of SANTIAGO's BMW

30. On January 5, 2022, Vergennes PD Det. Sgt. Jason Ouellette obtained a search warrant from a Vermont state court authorizing the search of SANTIAGO's BMW. The BMW had been secured by Middlebury PD at the time SANTIAGO was taken into custody. Det. Sgt. Ouellette executed the search warrant on January 5, 2022, and DEA SA Kevin Kadish and I were present for the search. The following items, among others, were seized from the BMW during the execution of the search warrant.

a. A red gas can was seized from the trunk of the BMW.

b. Approximately $4,540.00 in U.S. currency was seized from the center console between the driver's seat and the front passenger seat.

c. A blue Apple iPhone bearing IMEI: 353167663710010 was seized from the pocket of the driver's door.

d. A black Apple iPhone bearing IMEI: 355308084887882 was seized from the area underneath the driver's seat.

23

31. A Verizon receipt bearing the phone number for TARGET PHONE 1 was located in the vehicle and photographed.

32. I examined the red gas can seized from the trunk of the BMW and found it to be consistent in appearance with the red gas can observed being filled by SANTIAGO and placed in the front passenger seat in the video from Maplefields. I noticed that there was still liquid in the gas can. I estimated the can was less than half full, but there was a significant amount of liquid remaining in it.

33. On January 11, 2021, Vergennes PD Det. Sgt. Jason Ouellette turned over custody of the two Apple iPhones to DEA SA Kevin Kadish. Later that same day, SA Kadish turned over the two Apple iPhones to me. The two Apple iPhones are currently being stored in the ATF Burlington Field Office evidence vault.

34. On January 5, 2022, the United States Attorney's Office for the District of Vermont sent a request to Verizon Wireless pursuant to 18 U.S.C. § 2703(f) requesting the preservation of data associated with TARGET PHONE 1, TARGET PHONE 2 and TARGET PHONE 3, including the contents of communications retained by the service provider.

**Information Regarding Cellular Phones and Records**

35.   Based on my training and experience gained from direct participation in investigations into the distribution of controlled substances, including heroin, fentanyl, and cocaine base, I know that:

    a.   Distribution of controlled substances can be lucrative, and individuals who engage in such conduct are capable of amassing tens of thousands of dollars or more in a short periods and often physically retain such currency for long periods, even after their distribution activity has ceased;

    b.   It is common for sellers of controlled substances to put bank accounts, assets, and cell phones in the names of associates, family members, or fictitious names to avoid detection and to conceal illegitimate income;

    c.   Controlled substance traffickers maintain and access books, records, receipts, bills of sale, notes, ledgers, computer software, airline tickets, money orders, and other documents relating to the transportation, acquisition, and distribution of controlled substances and proceeds, and much of this information is commonly stored electronically on cellular telephones and other electronic devices capable of storing electronic data;

    d.   Traffickers in controlled substances commonly maintain names and contact information in books, ledgers, computers, cellular telephones, other electronic devices, and digital storage media, which reflect the names, nicknames, screen names, addresses, telephone numbers, and email addresses of their drug trafficking associates;

    e.   Persons involved in large-scale drug trafficking keep and access electronic records of the storage, purchase, and/or trading of currency, digital currency, financial instruments (including stocks, bonds, certificates of deposit, etc.), precious metals, jewelry, automobile titles, and other items of value, and those records can constitute evidence of financial transactions relating to the attainment—and concealment of the source of—large sums of money, whether in the form of notes, receipts, bank statements, check registers, financial account statements, wire transfer records, and documentation of foreign bank accounts; these records are often stored inside their cellular telephones long after they cease trafficking in drugs;

    f.   Drug traffickers amass proceeds from the sale of drugs, and they often attempt to legitimize ("launder") the proceeds using domestic and foreign banks, casinos, brokerage houses, real estate firms, shell corporations, business fronts, or other financial

25

institutions with their attendant services, including sales of securities, cashier checks, money drafts, money orders, wire transfers, and letters of credit; evidence of laundering attempts is commonly found within the electronic storage of their cellular telephones long after they cease trafficking drugs;

      g.    Persons engaged in criminal activity often spend the proceeds of their criminal activity and maintain or access records of their expenditures on their cellular telephones, long after their criminal activity has ceased—specifically, these records may include:

      i.    Records of income and expenses, such as profit and loss statements and income and expense journals that reflect the expenditure of the proceeds;

      ii.    Evidence of the expenditure of the proceeds or purchase of assets with the proceeds, such as invoices, receipts, rental statements, lease statements, travel records, earnest money agreements, escrow statements, and real estate deeds;

      iii.    Records of the accumulation of assets acquired with the proceeds of criminal activity, such as ledgers, balance sheets and financial statements, reflecting both assets and liabilities;

      iv.    Checking and savings account records consisting of monthly statements, duplicate deposit slips, and canceled checks reflecting the deposit and disbursement of proceeds;

      v.    Contracts and other agreements reflecting associates between individuals relative to business ventures;

      vi.    Images or other records of cashier's checks, money orders, and wire transfers involving the proceeds of criminal activity; and

      vii.    Photographs of the traffickers, their associates, their property, and their controlled substances, including photographs of currency and purchases constituting documentation of unexplained wealth that is consistent with trafficking in controlled substances.

36.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.      Cellular telephone: A cellular telephone (or mobile telephone, or wireless telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A cellular telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, cellular telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Electronic Devices may also include global positioning system ("GPS") technology for determining the location of the device.

b.      PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication device and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device. PDAs also often contain digital cameras.

c.      Smart Phone: Smart phone is a term typically used to refer to a cellular telephone that has combined the capabilities of a cellular telephone and a typical PDA.

d.      Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen

27

for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

      e.     GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

      f.     IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

      g.     Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between Device on the Internet often cross state and international borders, even when the Device communicating with each other are in the same state.

37.     Based on my training and experience, I know the Electronic Devices listed in

Attachment A are Smart Phones and include the features outlined above.

      a.     Based on my knowledge, training, experience, and discussions with other law enforcement officers, I know that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer or smart phone, the data contained in the file do not

actually disappear; rather, those data remain on the device's storage medium until they are overwritten by new data.

      b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by and active file—for long periods before they are overwritten. In addition, a device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

      c.     Wholly apart from user-generated files, computer storage media contain electronic evidence of how a computer has been used, what it has been used for, and who has used it (user attribution). To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Device users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

      d.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into temporary Internet directory or "cache."

38.     As further described in Attachment B, this application seeks permission to locate not only digital files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how the Electronic Devices were used, the purpose of their use, who used them, and when. There is probable cause to believe this forensic electronic evidence will be on the Electronic Devices for the following reasons:

      a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage Device or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created, and the sequence in which they were created, although this information can later be falsified.

29

b.    As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus spyware and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicting when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.    A person with appropriate familiarity with how a cellular telephone works can, after examining this forensic evidence in its proper context, draw conclusions about how a cellular telephone was used, the purpose of its use, who used it, and when.

      d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.     Further, in finding evidence of how a cellular telephone was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

**Conclusion and Requests**

39.  Based on the facts set forth in this affidavit, there is probable cause to believe that

evidence of crimes—specifically, violations of 21 U.S.C. §§ 841(a)(1), 843(b), and 846, which

include the distribution of controlled substances, the use of communication facilities in

furtherance of those distributions, and conspiracy to distribute controlled substances—and

violations of 18 U.S.C. §§ 844(e) and 1952—the use of a telephone to make a threat to damage

or destroy a building or vehicle by means of fire and travel in interstate commerce to commit an

act of violence to further an unlawful activity—committed by SANTIAGO, will be located in the

Electronic Devices.   Accordingly, I respectfully request the Court issue the Search Warrant

authorizing the search of the Electronic Devices described in Attachment A and the seizure of

the data described in Attachment B.

40.  Because this warrant seeks only permission to examine devices already in law

enforcement's possession, the execution of this warrant does not involve the physical intrusion

onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize

execution of the warrant at any time in the day or night.

Dated at Burlington, in the District of Vermont, this 18th day of January, 2022.


_____
Brian Wood, Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Sworn to and subscribed before me this 18th day of January, 2022.


_____
HON. KEVIN J. DOYLE, Magistrate Judge
United States District Court
District of Vermont